IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GARFIELD JONES, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL NO. 3:13-CV-00807 |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | (Judge Kane) |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

Plaintiff Garfield Jones has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Jones' claim for social security disability insurance benefits and supplemental security income benefits.  (Doc. 1).

Disability insurance benefits are paid to an individual if that individual is disabled and "insured."  Jones met the insured status requirements of the Social Security Act through December 31, 2013.  Tr. 40.[1]  Therefore, to be entitled to disability insurance benefits, Jones must establish that he suffered from a disability on or before that date.  42 U.S.C. § 423(a)(1)(A).

---

[1] References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.

I.   **BACKGROUND**

Jones protectively filed his applications for disability insurance benefits and supplemental security income benefits on December 29, 2009, claiming that he became disabled on March 1, 2009.  Tr. 38, 147, 151.  Jones has been diagnosed with degenerative disc disease, sleep apnea, a history of carpal tunnel syndrome, obesity, and depression.  Tr. 40, 316.  On July 15, 2010, Jones' applications were initially denied by the Bureau of Disability Determination.  Tr. 120, 124.

On August 17, 2010, Jones requested a hearing before an administrative law judge ("ALJ").  Tr. 134.  The ALJ conducted a hearing on July 16, 2011, where Jones was represented by counsel.  Tr. 55-79.   On September 6, 2011, the ALJ issued a decision denying Jones' applications.  Tr. 38-48.  On January 29, 2013, the Appeals Council declined to grant review.  Tr. 1.  Jones filed a complaint before this Court on March 28, 2013, and this case became ripe for disposition on February 21, 2014, when Jones filed a reply brief.  (Docs. 1, 24).

Jones appeals the ALJ's determination on three grounds: (1) the ALJ did not properly consider the medical opinions of record, (2) the ALJ failed to consider all impairments in combination at Step Three, and (3) the ALJ erred in his application of the vocational guidelines at Step Five.  (Doc. 18).  For the reasons set forth below, this case is remanded to the Commissioner for further proceedings.

II.   **STATEMENT OF RELEVANT FACTS**

Jones was fifty-two years of age at the time of the ALJ's decision; he is a high school graduate and is able to read, write, speak, and understand the English language.  Tr. 58, 59, 167.  Jones has past relevant work as a cook, which is classified as medium, skilled work, and as a kitchen helper, which is classified as medium, unskilled work.  Tr. 76.

### A.   Jones' Physical Impairments

On May 5, 2009, Jones presented to James Wornyo, M.D. complaining of low back pain.  Tr. 214.  Jones had a normal gait and station, as well as reflexes and sensations.  Tr. 216.  Jones had a decreased range of motion in the lumbosacral spine along with tenderness and tightness in the lumbosacral muscles.[2]  Id.

On May 21, 2009, Jones was examined in preparation for physical therapy relating to his low back pain.  Tr. 238-43. Though Jones' lumbosacral spine was tender to palpation, a straight leg raise test was negative, he was able to transition between sitting and standing independently, and he had an independent gait without deviation.  Tr. 242.  Jones' injuries were described as "minimum" in severity with "no impact" on his activities of daily living.  Tr. 243.  After attending ten physical therapy sessions, Jones was discharged from on June 23, 2009 after achieving all goals and improving in his functioning and independence. Tr. 249-53.

---

[2] A psychiatric review conducted at this appointment revealed intact judgment and insight, intact recent and remote memory, and a normal mood and affect.  Id.

On May 29, 2009, Jones visited the Wilkes-Barre General Hospital emergency room with increased low back pain and a flare-up of carpal tunnel problems.  Tr. 228.  Jones reported no numbness or motor weakness.  Id.  An x-ray of the lumbar spine revealed degenerative joint disease at the L5-S1 level, though there was "nothing acute."  Tr. 230, 233.  Jones was in no acute distress, denied extremity weakness, and had a normal gait.  Tr. 231.

Jones presented to the McKinney Clinic twice in June 2009 with complaints of low back pain and carpal tunnel symptoms.  Tr. 210-14.  Jones reported taking naproxen and flexeril, and attending physical therapy with "some relief."  Tr. 213.  Despite some tenderness over the L5-S1 region, a straight leg raise test was negative.  Id.

On July 14, 2009, Jones was examined by Mohammadre Azadford, M.D. for complaints of chronic low back pain.  Tr. 271.  Jones had tenderness in the L5-S1 region accompanied by a painful, limited range of motion.  Tr. 272.  A straight leg raise test was negative and there were no focal motor or sensory deficits.  Id.  Dr. Azadford prescribed Percocet to alleviate Jones' pain.  Id.

On July 24, 2009, Jones returned complaining of continuing low back pain and carpal tunnel syndrome symptoms.  Tr. 268.  Jones stated that Percocet helped with his back pain, and stated that his carpal tunnel syndrome symptoms were "feeling better with wrist braces[.]"  Id.  Jones hands were stiff, he was unable to

push against resistance, and he seemed to have pain with hand movement.  Tr. 269.

However, Kira Kiriakidi, M.D. noted that Jones was "observed on video freely

moving his hands."  <u>Id.</u>

On September 10, 2009, Arpita Mukherjee, M.D. examined Jones for low

back pain.  Tr. 265.  Dr. Mukherjee noted that Jones wanted "a disability form

filled based on his chronic back ache, but he does not have any reports to justify

disability."  <u>Id.</u>  Dr. Mukherjee filled out the disability form listing Jones "as

employable."  Tr. 266.  Jones had no paraspinal tenderness, and an examination of

his back was unremarkable.  <u>Id.</u>

Jones returned eight days later with continued complaints of back pain and

bilateral wrist pain.  Tr. 263.  Jones complained that his pain was getting worse,

but reported that physical therapy and Percocet were helping.  <u>Id.</u>  Tinel and Phalen

tests were negative bilaterally, and there was no clinical grip weakness in either

hand.  Tr. 264.  Jones had a full range of motion in his spine, was able to walk on

his toes and soles, and a straight leg test was negative bilaterally.  <u>Id.</u>  There was

some paraspinal tenderness, but reflexes were equal bilaterally.  <u>Id.</u>

Govind Kachhadiya, M.D. recommended that Jones continue with physical

therapy and Percocet because they were "helping" with his back pain.  <u>Id.</u>  In

regards to Jones' carpal tunnel syndrome, Dr. Kachhadiya opined that there was

"no clinical evidence of nerve irritation and [the] splint is helping" and therefore

recommended that Jones continue with pain killers and splints.  Id. Dr. Kachhadiya

stated that Jones was "employable" but could lift no more than twenty pounds and

could not be subjected to "prolonged standing then (sic) four hours."  Id.

An MRI was conducted on September 21, 2009 on Jones' lumbar spine.  Tr.

283.  This MRI revealed disc space narrowing at the L5-S1 level.  Id.  The MRI

also revealed a disc herniation at the L5-S1 level that encroached into the left

neural foramen and resulted in "mild" stenosis of the left neural foramen.  Id.

On December 4, 2009, Dr. Mukherjee again examined Jones.  Tr. 260.  He

noted that Jones was referred to pain management "but never went."  Id.  Jones had

a normal gait, a normal range of motion throughout, and mild paraspinal

tenderness in the lumbar spinal region.  Tr. 261.

On May 20, 2010, Jones presented to William Hottenstein, M.D. with

complaints of chronic pain in his hands related to carpal tunnel syndrome.  Tr. 346.

There were no complaints of numbness or weakness, and Jones was able to

ambulate well.  Id.  On September 13, 2010, Jones complained of right arm pain

and numbness, but denied any gait disturbance.  Tr. 328.  Keino Johnson, D.O.

noted that Jones had been prescribed "splints and Naprosyn [for his carpal tunnel

syndrome] but did not use" either.  Id.  Despite his complaints, Jones had no

sensory deficits in his right arm, and had normal strength and a normal range of

motion.  Id.

On December 22, 2010, Jones presented to the Geisinger Wyoming Valley Medical Center sleep disorders center with possible sleep apnea.  Tr. 352.  Jones reported severe daytime sleepiness and scored a twenty-two out of twenty-four on the Epworth Sleepiness Scale.  Id.  Jones denied feeling depressed or hopeless during the previous month, and denied being bothered by little interest or pleasure in doing things.  Tr. 353.  Jones had a normal gait and station, and his reflexes were normal and symmetric.  Tr. 354-55.

A polysomnogram was conducted on January 5, 2011.  Tr. 360-69.  This exam revealed "severe obstructive sleep apnea" that improved with the use of a CPAP machine "at 12cm H2O, which reduced obstructive events from 59.3 per hour to 1.8 hypoapneas per hour."  Tr. 360.  Jones was prescribed a CPAP machine for home use.  Tr. 363.  At a follow-up appointment on April 14, 2011, it was noted that Jones "had compliance issues since starting CPAP [use] due to [his] mask feeling uncomfortable."  Tr. 370.  Jones reported feeling better overall and more alert with CPAP therapy, and felt rested upon waking.  Id.  His Epworth score improved to twenty-one out of twenty-four.  Id.  Jones stated that his CPAP mask was "more comfortable.  He was offered [a] new mask, but declined."  Tr. 371.

On May 26, 2011, it was noted that Jones' compliance issues continued, though he had slightly improved his CPAP machine usage.  Tr. 374.  His Epworth

score improved to eighteen out of twenty-four.  Id.  By June 23, 2011, Jones was

still "not compliant with CPAP."  Tr. 375.  Jones reported that he would fall

"asleep before putting [his] mask on.  He like[d] the mask" he was using at the

time.  Id.  His Epworth sleep score improved to ten out of twenty-four.  Id.

### B.    Jones' Mental Impairments

Prior to the relevant period, Jones was hospitalized for depression from

August 7, 2007 until August 15, 2007.  Tr. 197-98.  Thereafter, Jones did not seek

mental health treatment again until March 9, 2010 when he presented to Dr.

Wornyo with depression.  Tr. 336.  Jones reported crying daily and having

difficulty sleeping and eating after the death of his wife.  Id.  Jones denied suicidal

ideation, but expressed that he needed help.  Id.  Dr. Wornyo diagnosed Jones with

"depression vs grief" and prescribed Zoloft and Xanax for short term use.  Tr. 338.

On March 18, 2010, Jones was examined by Dr. Selgoma at Community

Counseling Services of Northeastern Pennsylvania ("CCS").  Tr. 383.  Jones

reported auditory hallucinations and being very depressed after his wife's death.

Tr. 384.  Jones was neatly groomed, was oriented, had intact memory, and a

normal thought process.  Tr. 390.  He had a depressed mood, restricted affect, and

was cooperative but tearful with quiet speech.  Id.  He had fair insight and

judgment and good motivation for treatment.  Tr. 391.  Jones was diagnosed with

major depressive disorder, recurrent, and bereavement.  Tr. 383.  Jones was

assigned a GAF score of fifty.[3]  Id.

On April 12, 2010, Jones returned to CCS for a medication check-up.  Tr.

414.  Jones was still having difficulties with the death of his wife; he was tearful

and stated that he had trouble sleeping.  Id.  Jones was alert and oriented with

appropriate behavior.  Id.  He denied suicidal or homicidal ideation, racing

thoughts, hallucinations, delusions, or obsessions.  Id.  He was depressed and

tearful with a flat affect; his memory was intact, though his insight and judgment

were only fair.  Id.

Jones was hospitalized from May 19, 2010 until May 24, 2010 as a result of

his major depressive disorder.  Tr. 340-45.  On admission Jones' GAF score was

twenty-five.[4]  Tr. 345.  At admission, Jones' depression was manifested by crying

spells, psychomotor retardation, a loss of energy and ambition, a loss of sensation,

an inability to sleep, and an inability to concentrate.  Tr. 340.  Jones was

disoriented to time and place, and could not eat or sleep.  Tr. 413.  He was given

supportive treatment during his hospitalization and "was able to overcome these

---

[3] A GAF score of 41-50 is indicative of "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

[4] A GAF score between 21 and 30 indicates that the individual's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."  Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

difficulties gradually, [and] was discharged after reaching maximum benefit as [an] inpatient." Tr. 340.  At discharge, Jones had no psychomotor retardation, was coherent and relevant, had a "more positive attitude," was non-psychotic, and was assigned a GAF score of sixty-five.[5]  Tr. 341-42.

From May 2010 until October 2010 Jones continued presenting to CCS for medication checks and therapy related to his depression.  Tr. 405-12.  Jones consistently complained of depression and anxiety, and generally had a blunted affect.  Id.  Jones often reported hallucinations and racing thoughts, as well as occasional paranoia.  Id.  Jones' insight and judgment was fair and his memory was intact.  Id.

On November 19, 2010, Jones had a pleasant mood, but his affect remained blunted.  Tr. 404.  Jones continued to report audio hallucinations, but his memory was good and he had fair insight and judgment.  Id.  In January 2011, Jones had a euthymic mood and denied hallucinations.  Tr. 401.  He was alert and oriented, had good memory, fair insight and judgment, and denied suicidal or homicidal ideation.  Id.  By March 2011, Jones had a pleasant mood and full affect, but remained depressed.  Tr. 397.  Jones continued to have similar psychological findings through May 2011.  Tr. 396-99.

---

[5] A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning fairly well with some meaningful interpersonal relationships.  See, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

### C.   Residual Functional Capacity Assessments

On September 24, 2009, Jeffrey Freemont, Ph.D., examined Jones and offered an opinion regarding Jones' mental residual functional capacity.  Tr. 255-59.  Dr. Freemont noted that Jones had previously been prescribed Zoloft and Seroquel; Jones reported that these medications had been "helpful" but he was no longer taking the medication because he could not afford the costs.  Tr. 256.  He denied problems with peers or supervisors when working.  Id.  Jones was alert and oriented, his cognitions were intact, and he had appropriate behavior and appearance, though his mood was depressed with an appropriate affect.  Id.  Jones admitted to auditory hallucinations and infrequent visual hallucinations.  Id.

Jones had a productive thought process with continuity, and his content of thought was without preoccupation or disturbance.  Tr. 257.  He was able to identify two out three paired word correctly, but could not identify simple analogies.  Id.  Jones' fund of information was "quite poor" and his concentration was poor.  Id.  Jones was unable to perform serial 2s, 3s, or 7s, could not subtract simple numbers, could not divide or multiple, and struggled with simple addition problems.  Id.  Jones' remote memory was intact, but his recent memory was poor.  Id.  He was able to recall two unrelated digits both forward and backward and could correctly identify two out of three examples.  Id.  Dr. Freemont believed that Jones' social judgment was fair to poor and assigned a GAF score of fifty.  Id.

11

Dr. Freemont opined that Jones had a fair ability to: (1) follow work rules, (2) relate to co-workers, (3) deal with the public, (4) interact with supervisors, (5) deal with work stress, (6) maintain personal appearances, (7) behave in an emotionally stable manner, (8) relate predictably in social situations, and (9) demonstrate reliability.  Id.  He believed Jones had fair to no ability to maintain concentration and attention, or to understand, remember, and carry out simple instructions.  Id.  Dr. Freemont further opined that Jones had no ability to: (1) use judgment, (2) function independently, (3) understand, remember, and carry out complex instructions, and (4) understand, remember, and carry out detailed but not complex instructions.  Id.

On May 12, 2010, William Anzalone, Psy.D. evaluated Jones and completed a residual functional capacity assessment.  Tr. 286-93.  At the examination, Jones was cooperative and demonstrated appropriate eye contact.  Tr. 289.  Jones was tearful when discussing the death of his wife, and reported having no appetite and losing interest in doing any activities.  Tr. 289-90.  His speech was quiet but goal directed, relevant, and logical; he had no tangential or loose associations.  Tr. 291.  Jones also reported audio and visual hallucinations.  Id.  He had an intact fund of information, but was unable to interpret proverbs, perform serial 7s, spell "world" backwards, or perform simple multiplication.  Id.

Jones had impaired working memory.  Id.  He was able to repeat three objects immediately and again after five minutes.  Id.  He was able to repeat four digits forward and three digits backward.  Id.  Dr. Anzalone opined that Jones "was able to understand, retain, and follow basic verbal and written instructions."  Id. Jones had intact impulse control and social judgment, but restricted insight into his situation.  Tr. 292.  Dr. Anzalone diagnosed Jones with depressive disorder and bereavement.  Id.  He believed that Jones' prognosis was fair to guarded.  Tr. 292.

Dr. Anzalone opined that Jones was moderately limited in his ability to: (1) understand, remember, and carry out detailed instructions, (2) make judgments on simple work-related decisions, (3) interact appropriately with the public, (4) respond appropriately to work pressures in a usual work setting, and (5) respond appropriately to changes in a routine work setting.  Tr. 287.

On June 28, 2010, Nathan Grutkowski, Ph.D. reviewed Jones' medical records and completed a mental residual functional capacity assessment.  Tr. 294-310.  Dr. Grutkowski opined that Jones had mild restrictions in his activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, and had experienced no episodes of decompensation within the relevant period.  Tr. 304.  Dr. Grutkowski further opined that Jones was moderately limited in his ability to carry out detailed

instructions and get along with co-workers without distracting them or exhibiting

behavioral extremes.  Tr. 307-08.

> Dr. Grutkowski believed that Jones'

> basic memory processes are intact.  He is able to carry out very short and simple instructions.  He is able to get along with others in the workplace without distracting them.  He can sustain an ordinary routine without special supervision.  Moreover, he retains the ability to perform repetitive work activities without constant supervision.  There are no restrictions in his abilities in regard to understand and memory and adaptation.

Tr. 310.

On July 7, 2010, Mark Bohn, M.D. reviewed Jones' medical records and

offered an assessment of Jones' physical limitations.  Tr. 311-17.  Dr. Bohn

believed that Jones could occasionally lift or carry up to twenty pounds, and could

frequently lift or carry ten pounds.  Tr. 312.  Jones could frequently use ramps,

could occasionally stoop, crouch, crawl, or climb stairs, but could never climb

ladders, ropes, or scaffolds.  Tr. 313.  Dr. Bohn opined that Jones must avoid

concentrated exposure to cold or hazards.  Tr. 314.

Dr. Bohn diagnosed Jones with degenerative disc disease of the lumbosacral

spine, depression, obesity, and a history of carpal tunnel syndrome.  Tr. 316.

However, Dr. Bohn noted that no impairment was seen in relation to the carpal

tunnel syndrome.  Id.  Dr. Bohn noted that, although Jones' lumbosacral region

was tender, overall he had a good range of motion, a normal gait and station, and

negative straight leg raise tests.  Id.  Jones' treatment had "been essentially routine and conservative in nature[, and the] record reflect[ed] significant gaps in his treatment history."  Id.  Jones' medical records revealed that his "medications have been relatively effective in controlling his physical symptoms."  Id.

### C.    The Administrative Hearing

On July 26, 2011, Jones' administrative hearing was conducted.  Tr. 55-79. At that hearing, Jones testified that he had left his last place of employment due to severe depression after the death of his wife.  Tr. 60.  Jones stated that his depression was the primary reason why he could not work; because of depression he did not "feel like doing much of anything."  Id.  Jones complained of back pain and numbness and tingling in his hands from carpal tunnel syndrome.  Tr. 61.

He reported that his medication were working fairly well and allowed him to sit for about one hour at a time and walk for long distances.  Id.  Jones stated that his sleep apnea was now controlled through the use of a CPAP machine, and he felt well rested "[m]ost of the time."  Tr. 67.  Despite the use of a machine, Jones still fell asleep involuntarily five or six times each day.  Tr. 69.  Jones testified that he spent most days watching television.  Tr. 63.  He enjoyed gardening, but was unable to muster the motivation to plant a garden that year.  Tr. 63, 74-75.

After Jones testified, Jody Doherty, an impartial vocational expert, was called to give testimony.  Tr. 76.  The ALJ asked Ms. Doherty to assume a

hypothetical individual who was limited to light work[6] but could not crawl, kneel, or climb.  Tr. 77.  The hypothetical individual could occasionally bend and stoop, but should not be exposed to temperature extremes, high humidity, or vibration. Id.  Furthermore, the individual was limited to simple, repetitive tasks in a low-stress environment.  Id.  The ALJ defined low-stress environment as "involving only occasional changes in the work setting, and no fast-paced production[.]"  Id.

Ms. Doherty opined that the hypothetical individual would not be able to perform Jones' past relevant work.  Id.  However, the individual would be capable of performing three other jobs that exist in significant numbers in the national economy: a mail sorter, a paper grader, or a retail marker.  Tr. 77-78.

III.   **DISCUSSION**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a

---

[6] Light Work is defined by the regulations of the Social Security Administration as work "with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v.
Underwood</u>, 487 U.S. 552, 565 (1988) (<u>quoting</u> <u>Consolidated Edison Co. v.
N.L.R.B.</u>, 305 U.S. 197, 229 (1938)).  Substantial evidence has been described as
more than a mere scintilla of evidence but less than a preponderance.  <u>Brown v.
Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed record
substantial evidence may be "something less than the weight of the evidence, and
the possibility of drawing two inconsistent conclusions from the evidence does not
prevent an administrative agency's finding from being supported by substantial
evidence." <u>Consolo v. Fed. Mar. Comm'n</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in
the record," <u>Cotter v. Harris</u>, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into
account whatever in the record fairly detracts from its weight."  <u>Universal Camera
Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971).  A single piece of evidence is not
substantial evidence if the Commissioner ignores countervailing evidence or fails
to resolve a conflict created by the evidence.  <u>Mason v. Shalala</u>, 994 F.2d 1058,
1064 (3d Cir. 1993).  The Commissioner must indicate which evidence was
accepted, which evidence was rejected, and the reasons for rejecting certain
evidence.  <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 203 (3d Cir. 2008).
Therefore, a court reviewing the decision of the Commissioner must scrutinize the
record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims.  See 20 C.F.R. § 404.1520; Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91-92 (3d Cir. 2007).  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work, and (5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. § 404.1520.   The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  Mason, 994 F.2d at 1064.

### A.    The ALJ's Evaluation of Medical Opinions

Jones first argues that the ALJ erred in his evaluation of the medical opinions offered in assessment of Jones' mental and physical functional limitations. (Doc. 18).  Specifically, Jones contends that the ALJ rejected the opinion of Jones' treating physician and two examining physicians without explanation.  Id.

i.    Opinions as to Jones' Mental Limitations

The ALJ reviewed all relevant evidence contained within the administrative record, including the opinions of two psychological consultative examiners, Drs. Anzalone and Freemont.  Tr. 43-46.  The ALJ gave "great weight" to the diagnoses offered by Dr. Anzalone while rejecting some of the functional limitations that he offered.  Tr. 46.  The ALJ recited some of the findings made by Dr. Freemont, and gave "significant weight" to the GAF score assigned by Dr. Freemont.  Tr. 45, 46. However, the ALJ did not discuss any functional limitations offered by Dr. Freemont, and did not provide any explanation for rejecting the limitations offered by Dr. Freemont.  Id.

An ALJ must consider all pertinent evidence contained within the administrative record, and must "explain his [or her] reasons for discounting" such evidence.  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000). "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence."  Id. (citing Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999); Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)).

Dr. Freemont opined that Jones was limited in numerous ways.  Tr. 258. The ALJ did not discuss these limitations, and implicitly rejected Dr. Freemont's opinion without explanation.  Tr. 45-46.  Dr. Freemont opined that Jones had fair

to no ability to maintain attention or concentration, fair to no ability to understand, remember, and carry out simple instructions, and no ability to function independently.  Tr. 258.  This assessment comported with Dr. Freemont's findings that Jones' fund of information was "quite poor" and his concentration was poor. Tr. 257.  These limitations were further buttressed by Jones' inability to identify simple analogies, inability to perform serial 2s, 3s, or 7s, and inability to multiply, divide, subtract, or perform simple addition.  Id.

The limitations offered by Dr. Freemont were also supported by Jones' hallucinations and fair to poor social judgment.  Tr. 256-57.  Dr. Freemont's opinion was also supported by the findings of Dr. Anzalone.  Dr. Anzalone also found that Jones was unable to perform serial 7s or complete basic multiplication problems.  Tr. 291.  Dr. Anzalone also found that Jones had impaired working memory.  Id.

Dr. Freemont's opinion was well supported by his clinical findings and examination, as well as other evidence contained within the administrative record. Without any explanation from the ALJ as to why Dr. Freemont's well-reasoned assessment was rejected, this Court cannot determine "if significant probative evidence was not credited or simply ignored."  Burnett, 220 F.3d at 121 (quoting Cotter, 642 F.2d at 705).  On remand, the ALJ must consider the opinion of Dr. Freemont and, if the ALJ should choose to reject that opinion, provide sufficiently

detailed reasons for rejecting Dr. Freemont's residual functional capacity assessment.

ii.     Opinions as to Jones' Physical Limitations

One physician of record, Dr. Bohn, offered a complete residual functional capacity assessment and opined that Jones was limited to light work with some non-exertional limitations.  Tr. 311-17.  Jones' treating physician, Dr. Kachhadiya, opined that Jones was "employable" so long as the job did not require lifting more than twenty pounds, and involved "no prolonged standing then (sic) four hours." Tr. 264.

The preference for the treating physician's opinion has been recognized by the United States Court of Appeals for Third Circuit.  Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason."  Id. at 317 (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)).

Although a treating physician opined that Jones had some limitations in his ability to stand, the ALJ did not err in refusing to accommodate that opinion because overwhelming evidence supports a conclusion that Jones was not limited in his ability to stand.  Throughout the relevant period, Jones consistently had a

normal gait and station.  Tr. 231, 242, 261, 264, 328, 354.  Jones' lower extremity

strength was full and his reflexes and sensations were intact.  Tr. 216, 228, 231,

264, 354-55.  Straight leg raise tests were negative without exception.  Tr. 213,

242, 264, 272. Though Jones did frequently report tenderness in his lumbar spine

and occasionally had a reduced range of motion, physical examinations were

consistently normal.  Tr. 213, 216, 242, 261, 264, 272.

Furthermore, Jones reported that he was able to walk "pretty far" and walked

to his medical appointments and to an appointment with his attorney.  Tr. 62, 69-

70.  Jones never complained of increased pain in his back or legs with prolonged

standing.  A physical therapist opined that Jones' low back impairment had "no

impact" on his activities of daily living.  Tr. 243.  The sum of this evidence reveals

that Jones' physical impairments had little, if any, effect on his ability to stand

throughout a workday.  In light of the overwhelming evidence supporting the

ALJ's conclusion that Jones was not limited in his ability to stand, the ALJ did not

err in failing to adopt Dr. Kachhadiya's opinion.  See, Johnson, 529 F.3d at 204

(finding that an ALJ may reject a treating physician's opinion without discussion

where "[o]verwhelming evidence in the record discount[s] its probative value").[7]

---

[7] Because the ALJ did not err in failing to incorporate Dr. Kachhadiya's opinion in the residual functional capacity determination, and because Dr. Bohn opined that Jones could perform light work, substantial evidence supported the ALJ's decision that Jones could perform light work. Therefore, Jones' argument that the ALJ erred in failing to find him disabled based upon application of the Grids at Step Five is without merit.

## C.     The ALJ's Determination at Step Three

Lastly, Jones argues that the ALJ erred in failing to evaluate whether a combination of impairments met or equaled a listing at Step Three.  (Doc. 18). The Commissioner argues that the ALJ adequately addressed a combination of impairments and reasonably concluded that Jones' impairments in combination did not equal a listing.  (Doc. 19).

To be considered disabled at step three, an impairment or combination of impairments must meet or medically equal an impairment listed in the Social Security Administration's Regulations.  Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992).  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  Sullivan v. Zebley, 493 U.S. 521, 529–30 (1990) (emphasis in original).

The ALJ must "fully develop the record and explain his [or her] findings at step three."  Burnett, 220 F.3d at 126.  In that vein, the Third Circuit had repeatedly stated that "it is the ALJ's 'responsibility  . . . to identify the relevant listed impairment(s)' and 'develop the arguments both for and against granting benefits.'"  Torres v. Comm'r of Soc. Sec., 279 F.App'x 149, 152 (3d Cir. 2008) (quoting Burnett, 220 F.3d at 119–20 n. 2).  Thus, a conclusory statement that a claimant's impairment or combination of impairments does not meet a listing will

generally place the ALJ's decision "beyond meaningful judicial review." <u>Burnett</u>, 220 F.3d at 119-20.

In this case, the ALJ concluded that Jones "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]" Tr. 41. The ALJ offered no further explanation for why Jones' impairments in combination did not equal any listing. This conclusory explanation is insufficient to allow judicial review of the ALJ's decision and requires remand for further explanation. <u>See</u>, <u>Burnett</u>, 220 F.3d at 119; <u>Torres</u>, 279 F.App'x at 152.

The ALJ's conclusion at Step Three was further compromised by his failure to find obesity as a medically determinable impairment, or give explanation for discounting obesity as a medically determinable impairment. Dr. Bohn, a state agency physician, diagnosed Jones with obesity. Tr. 316. The ALJ reviewed Dr. Bohn's opinion and assigned it "great weight[.]" Tr. 46. Despite assigning great weight to this opinion, the ALJ failed to incorporate obesity into his findings, either as a severe or non-severe impairment. Tr. 40-41. As a result, the ALJ did not consider obesity in his determination at Step Three as Social Security rules mandate. <u>See</u>, <u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 503-04 (3d Cir. 2009).

On remand, the ALJ must consider all of Jones' impairments in combination and provide a sufficient explanation as to why the combination of impairments

does not meet or equal a listing.  The ALJ must further evaluate Jones' diagnosis of obesity, and account for that diagnosis at steps two, three, and four of the sequential evaluation process, or provide sufficient reasons for discounting obesity as a medically determinable impairment.

IV.    **CONCLUSION**

A review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An order consistent with this memorandum follows.


BY THE COURT:

s/Yvette Kane
Yvette Kane
United States District Judge

Dated: February 12, 2015